**IN THE UNITED STATES DISTRICT COURT**
**IN THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CASANDRA LORALAI BRIELLE JESSAMINE CHARBONNEAUX**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**EQUIFAX INFORMATION SERVICES LLC**<br><br>**Defendant.** | **Civil Action No.** |

# COMPLAINT

## PRELIMINARY STATEMENT

1. This is an action for damages brought by an individual consumer, Casandra Loralai Brielle Jessamine Charbonneaux, against Defendant Equifax Information Services LLC for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq*. as amended.

## PARTIES

2. Plaintiff Casandra Loralai Brielle Jessamine Charbonneaux is an adult individual who resides in Lancaster, PA.

3. Defendant, Equifax Information Services LLC ("Equifax") is a consumer reporting agency that regularly conducts business in Eastern District of Pennsylvania and which has a principal place of business located at 1500 Peachtree St., NW, Atlanta, GA 30309.

## JURISDICTION AND VENUE

4. Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. §§ 1331.

5. Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

***Defendant Equifax Practices Concerning the Sale of Reports on the "Deceased"***

6. Defendant Equifax are regulated as a "consumer reporting agency" ("CRA") under the FCRA. 15 U.S.C. § 1681a(e).

7. Defendant Equifax sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores. 15 U.S.C. § 1681a(e).

8. Pursuant to the FCRA, Defendant Equifax must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

9. Pursuant to the FCRA, Defendant Equifax must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes." 15 U.S.C. §§ 1681e(a) & 1681b.

10. Defendant Equifax place a "deceased" notation or marking on reports when it is advised from any of its many data furnishing sources that a given consumer is deceased.

11. The furnishing sources identify a "deceased" consumer by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the ECOA field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

12. Defendant Equifax does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark on that consumer's report.

13. Defendant Equifax does not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

14. Defendant Equifax does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

15. A deceased notation is a very unusual marking upon a credit file or credit report.

16. In some cases, in order to assure accuracy, Defendant Equifax sends letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their Equifax, Equifax, and Equifax credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. But Defendant Equifax has no similar procedure to notify the consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to Defendant Equifax to be placed in said consumer's credit file or report.

17. Defendant Equifax regularly receives the "Death Master File" from the Social Security Administration listing by social security number those consumers that the government believes to be deceased. But Defendant Equifax does not cross-reference the "X" code received from furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

18. Defendant Equifax will only use the Death Master File to sell additional products for an additional fee which are designed to show whether a given consumer is truly deceased.

19. Indeed, Defendant Equifax employs no procedures *at all* which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

20. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant Equifax employed no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

21. Even in instances where the purportedly deceased consumer communicates directly with Defendant Equifax, Defendant Equifax employed no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

22. Once a "deceased" mark is placed upon a consumer's report, Defendant Equifax will not calculate and will not provide a credit score for that consumer.

23. Nevertheless, Defendant Equifax routinely sells to third parties credit reports for persons with a "deceased" mark on their reports with no credit score, despite a request by the purchaser of the report for a credit score for that consumer.

24. Upon Defendant Equifax's reports with a "deceased" mark sold to third parties, Defendant Equifax never calculates or provides a credit score for that consumer.

25. Defendant Equifax knows that many third-party credit issuers require a credit score in order to process a given credit application.

26. Defendant Equifax knows that consumers without credit scores are unable to secure any credit from most credit issuers.

27. Defendant Equifax knows that living consumers are turned down for credit specifically because Defendant is reporting them as "deceased" and without a credit score.

28. Defendant Equifax has been put on notice for years through consumer disputes and lawsuits that living consumers are turned down for credit specifically because Defendant Equifax is reporting them as "deceased" and without a credit score.

29. Defendant Equifax has received and documented thousands of disputes from consumers complaining that their Equifax credit reports have them erroneously marked as "deceased."

30. Defendant Equifax knows that thousands of consumers are erroneously marked as "deceased" on their Equifax credit reports via an erroneous furnishing of the "X" code, but said consumers are not on the Death Master File and are, in fact, alive.

31. Nevertheless, Defendant Equifax employs no procedures which assure that a consumer marked as "deceased" on Defendant Equifax's reports are, in fact, deceased.

32. Even consumers who dispute the erroneous "deceased" status on their Equifax credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

33. Defendant Equifax has no independent procedure to change an erroneous deceased status on its own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, which reinvestigation was triggered by a consumer dispute.

34. Nor does Defendant Equifax employ any procedures to limit or stop the furnishing of reports to third parties for consumers which it has marked as "deceased" under any circumstances.

35. For years after a consumer's actual death, Defendant Equifax will continue to sell credit reports about that consumer.

36. Defendant Equifax will only remove a deceased consumer's file from its credit reporting database when it is no longer valuable to Equifax – meaning that nobody is continuing to buy those reports.

37. Defendant Equifax charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

38. Defendant Equifax profits from the sale of reports on the deceased.

39. Defendant Equifax has in its credit reporting database hundreds of thousands of "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

40. Defendant Equifax knows that truly deceased consumers do not apply for credit.

41. Defendant Equifax knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Equifax to be a common and major source of identity theft.

42. Defendant Equifax knows that identity theft and credit fraud are serious and widespread problems in our society.

43. Defendant Equifax warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and requires relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

44. Defendant Equifax has no similar death certificate, executorship paper, or any other proof requirements for its data sources which report a consumer as deceased or for the buyers of its reports which access the purportedly deceased consumer's information.

45. Indeed, Defendant Equifax sells reports of the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

46. For consumers who are deceased, there exists no permissible purpose under the FCRA for Defendant Equifax to ever sell its credit reports, absent a court order.

47. Defendant Equifax knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

***Case Specific Facts***

48. For a period of time since at least July 2020, Defendant Equifax has marked Plaintiff as "deceased" on her Equifax credit reports when Plaintiff is not deceased, and has been reporting derogatory and inaccurate statements and information relating to Plaintiff and Plaintiff's credit history to third parties that does not belong to the Plaintiff, and that actually belongs to another consumer (hereafter the "inaccurate information").

49. Defendant Equifax did not calculate or provide any credit score for or on Plaintiff, even though it sold reports about her to third parties marking her as "deceased."

50. The inaccurate information includes, but is not limited to, accounts with Vive Financial, Barclays Bank Delaware, Mariner Finance, Comenity Bank/Victoria Secrets, SYNCB/Networks, Capital One Bank USA NA, Fingerhut/Webbank and other personal information that does not belong to Plaintiff.

51. The inaccurate information negatively reflects upon the Plaintiff, Plaintiff's credit repayment history, Plaintiff's financial responsibility as a debtor and Plaintiff's credit worthiness.

The inaccurate information consists of accounts and/or tradelines that do not belong to the Plaintiff, and that actually belong to another consumer, in additional to a deceased notation.

52. Due to Defendant Equifax's faulty procedures, Defendant Equifax mixed the credit file of Plaintiff and that of another consumer with respect to the inaccurate information and other personal identifying information, and inaccurately reported Plaintiff as deceased.

53. Defendant Equifax has been reporting the inaccurate information through the issuance of false and inaccurate credit information and consumer credit reports that it has disseminated to various persons and credit grantors, both known and unknown.

54. Plaintiff's credit reports and file have been obtained from Defendant Equifax and have been reviewed many times by prospective and existing credit grantors and extenders of credit, and the inaccurate information has been a substantial factor in precluding Plaintiff from receiving many different credit offers and opportunities, known and unknown, and from receiving the most favorable terms in financing and interest rates for credit offers.

55. Plaintiff was denied for a mortgage loan as well as received an adverse interest rate on an auto loan in whole or in part because Defendant Equifax sold a credit report marking Plaintiff as deceased and based on the inaccurate information.

56. Plaintiff has disputed the inaccurate information with Defendant Equifax by following Defendant Equifax's established procedures for disputing consumer credit information.

57. Plaintiff has disputed the inaccurate information with Defendant Equifax from July 2020 through the present.

58. Notwithstanding Plaintiff's efforts, Equifax has sent Plaintiff correspondence indicating its intent to continue publishing the inaccurate information and Equifax continues to publish and disseminate such inaccurate information to other third parties, persons, entities and

credit grantors. Equifax has repeatedly published and disseminated consumer reports to such third parties from at least July 2020 through the present.

59. Despite Plaintiff's efforts, Equifax has never: (1) contacted Plaintiff to follow up on, verify and/or elicit more specific information about Plaintiff's disputes; (2) contacted all third parties that would have relevant information concerning Plaintiff's disputes; (3) forwarded any relevant information concerning Plaintiff's disputes to the entities originally furnishing the inaccurate information; (4) requested or obtained any credit applications, or other relevant documents from the entities furnishing the inaccurate information; and (5) performed any handwriting analysis.

60. Despite Plaintiff's exhaustive efforts to date, Defendant Equifax has nonetheless deliberately, willfully, intentionally, recklessly and negligently repeatedly failed to perform reasonable investigations/reinvestigations of the above disputes as required by the FCRA, has failed to remove the inaccurate information, and has continued to report the derogatory inaccurate information about the Plaintiff.

61. As a result of Defendant's conduct, Plaintiff has suffered actual damages in the form of lost loan and credit opportunities, credit defamation and emotional distress, including anxiety, frustration, embarrassment and humiliation.

62. At all times pertinent hereto, Defendant was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

63. At all times pertinent hereto, the conduct of the Defendant, as well as that of its agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

**COUNT I – EQUIFAX**
**VIOLATIONS OF THE FCRA**

64. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

65. At all times pertinent hereto, Defendant Equifax was a "person" and "consumer reporting agency" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

66. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

67. At all times pertinent hereto, the above-mentioned credit reports were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d),

68. Pursuant to 15 U.S.C. §1681n and 15 U.S.C. §1681o, Defendant Equifax is liable to the Plaintiff for willfully and negligently failing to comply with the requirements imposed on a consumer reporting agency of information pursuant to 15 U.S.C. § 1681e(b) and 1681i.

69. The conduct of Defendant Equifax was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages and harm to Plaintiff that are outlined more fully above and, as a result, Defendant Equifax is liable to Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

**JURY TRIAL DEMAND**

70. Plaintiff demands trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff seeks judgment in Plaintiff's favor and damages against the Defendant, based on the following requested relief:

(a) Actual damages;

(b) Statutory damages;

(c) Punitive damages;

(d) Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and 1681o; and

(e) Such other and further relief as may be necessary, just and proper.

Respectfully Submitted,

**FRANCIS MAILMAN SOUMILAS, P.C.**

BY: */s/ Mark D. Mailman*
MARK D. MAILMAN, ESQUIRE
ALEXIS I. LEHMANN, ESQUIRE
1600 Market Street, Suite 2510
Philadelphia, PA 19103
Telephone: (215) 735-8600

Dated: October 23, 2020 *Attorneys for Plaintiff*